## J. H. Grace v. The State.

### No. 2409. Decided June 25, 1902.

**1.—Murder—Furnishing Means by Which Another Commits Suicide—Charge—Construction of Statute.**

On a trial for murder, where it appeared that deceased took her own life with a pistol, and the court charged the jury, in effect, to convict defendant of the murder if he, with that intent, prepared and with malice placed the pistol where deceased could get and thus use it; said charge was predicated upon Penal Code, article 77, which makes a party a principal who prepares, with that intent, any means by which a person may injure himself. Held, the statute does not apply to cases of suicide, but is based upon the theory that the victim is not cognizant of the intent of the accused in preparing the means for the destruction of his or her life.

**2.—Same—Suicide.**

In Texas it is not a violation of any law for a person to take his own life, and the punishment of persons connected with the suicide, by furnishing the means or other agencies, does not obtain in Texas. We have no statute denouncing suicide or the punishment of those furnishing means by which a suicide is accomplished.

**3.—Same—Evidence Insufficient.**

See opinion for facts stated, which are held insufficient to support a conviction of murder in the second degree upon the theory that defendant was guilty of preparing and furnishing the means by which the deceased tock her own life, with intent that she should do so by said means.

**4.—Same—Evidence—Statements by Deceased.**

On a trial for murder, statements of deceased, in the absence of defendant, with regard to her intended elopement with defendant, were competent and admissible where it was shown that these statements had been directly brought to the knowledge of defendant and that he had discussed the same with the witness.

Vol. 44 Crim. Rep.—13.

Appeal from the District Court of Jones. Tried below before Hon. S. P. Hardwicke, Special Judge.

. The indictment charged appellant with the murder of Mollie Lane, on the 24th day of August, 1901, by shooting her with a pistol.

The opinion states the case.

*Steele & Stinson* and *Dewey Langford,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—The indictment charges appellant with the murder of Mollie Lane by shooting her with a pistol. He was convicted of murder in the second degree, and given five years in the penitentiary.

The court gave the following charge: "He is also guilty of murder who prepares means by which a person may kill himself and with intent that such person shall thereby kill himself, if death results from the means prepared, even if the deceased in fact killed himself. * * * Should you under the foregoing instructions find that defendant did not in fact shoot and kill Mollie Lane, then you are further instructed: If you find from the evidence that, in Jones County, Texas, on or about the time alleged in the indictment, the defendant J. H. Grace, knowing that said Mollie Lane intended to kill herself, if she did so intend, prepared a pistol, same being a deadly weapon, or instrument likely to produce death by the manner of its use, by placing the same where the said Mollie Lane would get it, and with the intent that the said Mollie Lane should get it, and with the intent that she with the pistol, if any, should shoot and kill herself, and the said pistol, if any, so prepared and placed, if it was so prepared and placed, was obtained by said Mollie Lane, if it was obtained, and she, the said Mollie Lane, with the pistol, if any, so prepared and placed, if it was so prepared and placed, did, in Jones County, Texas, on or about the time alleged in the indictment, shoot and kill herself, you will find defendant, J. H. Grace, guilty of murder. If you so find from the evidence, and find that defendant in so doing, if he did so do, acted on express malice, as heretofore defined, then you will find him guilty of murder in the first degree, and assess his punishment at death, or imprisonment in the penitentiary for life; or should you so find, but find that defendant in so doing, if he did so do, acted on implied malice, as above defined, then you will find defendant guilty of murder in the second degree," etc.

These charges were excepted to as not being the law, inapplicable to the facts, on the weight of evidence, and calculated to mislead the jury. This charge was framed under article 77, Penal Code, which provides: · "If any one, by employing a child or other person, who can not be punished, to commit an offense, or by any means, such as laying poison where it may be taken, and with intent that it shall be taken, or by preparing any other means by which a person may injure himself, and with intent

that such person shall thereby be injured, or by any other direct means, cause another to receive an injury to his person or property, the offender, by the use of such indirect means, becomes a principal." An inspection of this article of the code makes it fully certain that the injury intended to the person against whom the machinations or acts of the accused are directed, does not apply to cases of suicide. Should the accused lay poison where his intended victim may get it, and the victim does obtain it and is killed thereby, the victim being innocent of self-destruction, the accused would be guilty. In other words, this statute does not apply where the facts developed show the accused may have directly or indirectly furnished the means to a person, where that person's purpose is suicide. The statute above quoted is based upon the theory that the victim of the accused is not cognizant of the intent of the accused in preparing the means for the destruction of his or her life. It is not a violation of any law in Texas for a person to take his own life. Whatever may have been the law in England, or whatever that law may be now with reference to suicides, and the punishment of persons connected with the suicide, by furnishing the means or other agencies, it does not obtain in Texas. So far as the law is concerned, the suicide is innocent; therefore the party who furnishes the means to the suicide must also be innocent of violating the law. We have no statute denouncing suicidal acts; nor does our law denounce a punishment against those who furnish the suicide with the means by which the suicide takes his own life. Again, we do not believe the facts justify the charge. It was an assumption of facts not shown by the record. There is evidence that deceased had been criminally intimate with some man, and there is evidence tending to show that appellant was her paramour. There is testimony also showing that appellant and deceased contemplated an elopement. However, this was denied by both defendant and deceased. On the day of the fearful tragedy, the father and brothers of deceased had called appellant to their livery stable, some distance from appellant's home. When appellant left his home, deceased, appellant's wife and Miss Wilborn were there. Deceased and Miss Wilborn were there because they were not pleasantly situated at the home of deceased, where Miss Wilborn was visiting. On reaching the livery stable, the father and two brothers escorted appellant to the rear part of the stable, drew their pistols and announced to him that they intended to take his life; and one of the brothers tendered him a pistol with which to defend himself. This was declined. At this juncture the father of appellant reached the scene and took charge of his son, rescuing him from the hands of his would-be slayers. About the time he was leaving the livery stable, a phone message announced that deceased had taken poison; and two physicians, besides appellant (who was also a physician), hastily hurried to appellant's residence to the assistance of the poisoned girl. In the absence of appellant she had found his small case of medicines, and took from it a bottle of digitalis. The wife of appellant and Miss Wilborn undertook to secure this bottle

or take it away from her, and it seems in the struggle most of it was wasted; at least she swallowed but a small dose. This had no serious effect upon her; in fact, it seemed to have had none, except perhaps causing some agitation of the stomach, producing vomiting. Deceased most strenuously declined to receive the ministration of the physicians, declaring her intention to take her life, and if she did not succeed by this means, she would resort to other means; that she had made up her mind to take her life. Shortly after the physicians left, one of the brothers of the deceased came to the residence of appellant, and engaged in a conversation with deceased. During the conversation he stated that she might go away with appellant, but if she did he would follow and kill both of them. About this time Ed Harper came up in front of appellant's residence in a buggy, and inquired of appellant if he was armed; being informed that he was not, he handed appellant his pistol, and informed him of the fact that he would need it to defend himself against the father and brothers of deceased; that he was likely to get into very serious trouble. Appellant took the pistol. As deceased's brother left appellant's residence, after the conversation with his sister, appellant followed him into or near the street, and a quarrel ensued, in which Lane applied to appellant the epithet of "son of a bitch." Appellant reached for his pistol, and demanded a retraction of the expression, and while discussing this, appellant's wife approached and requested Lane to make retraction, which he did, as he said, for her sake. The parties separated. Appellant, his wife and deceased, who had gone out into the yard in the meanwhile, went back into the house. Appellant took the pistol from the waistband of his pants and laid it upon what the witnesses term the "higher part of the dresser," and lay down upon a bed in the same room. Appellant's wife took a seat in one portion of the room, near the door; Miss Wilborn seated herself in another portion, and deceased upon what the witness called the "lower part of the dresser." The disturbance between deceased and her family became the subject of conversation betwen Miss Wilborn and deceased. Finally deceased remarked that she would terminate or settle the whole matter, and instantly reached for the pistol, turned the muzzle upon her breast and fired, producing almost instantaneous death. Appellant jumped up from the bed, washed the girl's face, examined the wound, and found that she was dead. This is the testimony of all the eyewitnesses of this unfortunate tragedy. As we understand the record, there is no evidence showing or tending to show that appellant placed the pistol on the dresser for the purpose or with the intent that deceased should use it in inflicting the fatal wound.

As explained by the bill of exceptions, we are of opinion that the testimony of Mrs. Erickson, to the effect that appellant and deceased had agreed to elope, was properly admitted. Under her statement, deceased informed her of that fact, and very shortly afterwards appellant, discussing the same matter with her, alluded to the fact that deceased had informed her of the fact and that he was cognizant of the statement

of the deceased to witness to the effect that they intended to elope. The objection to this testimony, that it was matters occurring in the absence of defendant, is not well taken. It was brought directly to his knowledge and he discussed the matter with the witness.

The matter as to the action of the court with reference to the jury in their retirement will not occur upon another trial, and consequently will not be discussed.

For the errors indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*