A. J. SANDERS v. THE STATE.

No. 3749. Decided June 24, 1908.

**1.—Murder—Indictment—Suicide—Statutes Construed.**

Articles 77, 647, 648 and 649 make it clear and fully certain that the injury intended to the person against whom the acts of an accused are directed does not apply to cases of suicide; although the accused may have directly or indirectly furnished such means to a person who voluntarily and knowingly becomes a suicide; and an indictment which did not negative the idea that the deceased voluntarily and freely took the poison, and which failed to allege a want of knowledge on the part of the deceased, or that defendant caused the deceased in any manner either by force, threats or fraud to swallow the poison is insufficient.

**2.—Same—Administering Poison as Medicine—Charge of Court.**

Where the indictment in a prosecution for murder charged the administration of poison as a medicine and the evidence showed that the deceased could not have been ignorant of the deadly character of the poison at the time of taking it, and could not have been under the impression that it was a medicine, the conviction cannot be sustained, and a charge contrary to such evidence was error.

**3.—Same—Charge of Court— Suicide.**

Where upon trial for murder the indictment charged the defendant with administering poison to the deceased as a medicine, and there was evidence that the deceased took the poison voluntarily and knowingly, the court should have submitted defendant's special charge on this phase of the case.

**4.—Same—Evidence—Contradicting Witness.**

Where upon trial for murder charging defendant with administering poison to the deceased as medicine, the father of the deceased was used as a State's witness and who had testified that the deceased had been always cheerful and happy, the court erred in not permitting defendant on cross-examination, for the purpose of contradicting said witness, to show that the deceased had recently made an effort to suicide by taking strychnine, and that a physician had warned the witness to watch deceased.

**5.—Same—Evidence—Impeachment of Witness.**

Where upon trial for murder the State's witness had testified as to the surroundings and condition of deceased's body which would controvert the theory of suicide by deceased, it was error not to permit defendant on cross-examination to show that the witness had made statements out of court that the deceased had suicided.

**6.—Same—Evidence—Impeachment of Witness.**

Where upon trial for murder the State's witness testified on direct examination to various spots and discolorations on the face and neck of the deceased as discovered by him on the morning of the death of the deceased, it was error not to permit defendant on cross-examination of said witness to show that the witness on a previous examining trial had testified that he had seen no marks of violence on the body of the deceased.

**7.—Same—Evidence—Acts and Declarations of a Third Party.**

Upon trial for murder where the defendant was charged with administering poison to the deceased as medicine, it was error to permit testimony that the deceased had made visits to her sister who resided at the home of the defendant and other places, when the defendant was not there and had no knowledge of such visits.

Appeal from the District Court of Clay. Tried below before the Hon. J. W. Patterson.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*W. E. Forgy, R. E. Taylor* and *L. H. Mathis,* for appellant.—On question of the court's charge: Grace v. State, 44 Texas Crim. Rep., 193; 69 S. W. Rep., 529.

*F. J. McCord,* Assistant Attorney-General and *Dayton Moses,* District Attorney, for the State.

DAVIDSON, PRESIDING JUDGE.—The indictment contains three counts. It is unnecessary to mention the third count, for it was not considered in the charge, and passes out of the case. The first count charges homicide by poison in that the deceased was induced to believe that the carbolic acid administered was only a medicine. The second count charged as follows, omitting former parts: "Did then and there unlawfully and with his malice aforethought, wickedly contriving and intending to unlawfully kill one Pearl Baxter with poison, did administer to and cause to be taken by the said Pearl Baxter into her stomach, a deadly quantity of a certain deadly poison called carbolic acid, he, the said A. J. Sanders, then and there knowing the same to be a deadly poison in quantity and kind as so administered by him and taken by the said Pearl Baxter; and the said Pearl Baxter did take and swallow down the same into her body; and by means of the taking of which deadly poison into the stomach and body of the said Pearl Baxter, she, the said Pearl Baxter, did, on or about the 20th day of August, A. D., 1906, die in the county and State aforesaid; and the grand-jurors aforesaid, upon their oaths aforesaid, do say that the said A. J. Sanders, in the manner and form aforesaid, unlawfully and of his malice aforethought, did kill and murder the said Pearl Baxter, contrary to the law and against the peace and dignity of the State." It is urged by appellant that this count of the indictment does not sufficiently charge a homicide by poison, because it neither alleges that the poison charged to have been administered by the

defendant was taken by the deceased without knowledge as to what it was, nor its deadly effect, and further, that it fails to charge that it was administered by force, by threats or by fraud on the part of the defendant, and therefore, the count is wholly insufficient to charge any offense against the law. We are of opinion that the criticisms are technically correct. Under our statutes the mere fact of administering poison from which a party dies is not necessarily homicide. All the facts contained in the count quoted could be true, and appellant not guilty of murder. However, wickedly or maliciously may have been the purposes or intent of the accused in administering the poison as charged, yet if the deceased took the poison voluntarily, knowing what the result might be, her death would not constitute culpable homicide. The means and manner by which appellant administered the poison is not charged. If he had induced deceased to take it under the impression on her part that the carbolic acid was a medicine, and death had resulted, the killing would be murder. If he had forced it down her throat, or had caused her to take it against her will, it still would be murder, or if by threats or by fraud, or by any sort of manner, he had induced her to take the poison, and she did not know the probable consequences of taking it, it would be murder. But if she knew at the time she took the acid of its deadly character, or she took it and did it for the purpose of committing suicide and ending her life, and the appellant in no way actually gave it to her, it would not be murder. The indictment, therefore, fails to allege sufficiently a want of knowledge on her part at the time she took it, or that appellant caused her in any manner either by force or threats or by fraud to swallow it. Therefore, as stated above, this count in the indictment as presented could be true and yet appellant not violate the law. Further, it does not negative the idea that she (deceased) voluntarily and freely took the acid herself. Article 648 of the Penal Code provides: "If any person shall, with intent to injure, cause another person to inhale or swallow any substance injurious to health, or any of the functions of the body, if such substance was administered with intent to kill, he shall be punished by confinement in the penitentiary not less than two nor more than five years." Article 649 of the Penal Code is as follows: "If by reason of the commission of the offenses named in the two preceding articles, the death of a person be caused within one year, the offender shall be deemed guilty of murder and be punished accordingly." Looking back to Article 647 of the Penal Code we find it provides: "If any person shall mingle or cause to be mingled any other noxious substance with any drink, food or medicine, with intent to kill or injure any other person, or shall wilfully poison or cause to be poisoned any spring, well, cistern or reservoir of water with such intent, he shall be punished by imprisonment in the penitentiary not less than two nor more than ten years." An inspection of these articles make it manifest that in order for an accused to violate either there must be an intent to injure in causing another person to inhale or swallow injurious substances or to administer it

with intent to kill, or in mingling or causing to be mingled these poisonous substances with drink, food or medicine, or poisoning springs, wells, cisterns, or reservoirs of water, and it is further obvious that the administration or the use by the intended victim of the poisonous matters must be unknown to the party so taking or using, or the party administering the poisons or causing the injury must do it by some personal act to the party sought to be injured, and the statutes exclude the idea that the medicines are taken voluntarily by the person sought to be injured. It may be correctly stated, however, at this point that if the person in fact by his own hand gave or administered the medicine, even then he might be guilty, but these statutes exclude the idea, as we understand them, that the mere fact that a party seeking to injure another, gives to the other the poison with knowledge on the receiver's part of its deadly character, and the receiving party swallows it or takes it designing to have injurious effect upon him or herself, then the party administering or giving would not be guilty, for in that state of case, if death resulted, it would be a suicide. This is especially fortified when we look to article 77 of the Penal Code, which thus reads: "If any one, by employing a child or other person, who cannot be punished, to commit an offense, or by any means such as laying poison where it may be taken, and with intent that it shall be taken, or by preparing any other means by which a person may injure himself, and with intent that such person shall thereby be injured, or by any other indirect means, cause another to receive an injury to his person or property, the offender, by the use of such indirect means, becomes a principle." This statute is entirely in harmony and correlates fully with the articles above quoted. An inspection of this article as well as article 647, 648 and 649, makes it clear and fully certain that the injury intended to the person against whom the acts of an accused are directed does not apply to cases of suicide. If the party accused of providing the means or administering the poison or other noxious substances, places it where his intended victim may secure it, and that victim does obtain and use it and is thereby killed, the victim being innocent of self-destruction, the accused in that event would be guilty. These statutes do not apply where the facts show the accused may have directly or indirectly furnished such means to a person where that person takes it voluntarily so as to become a self-destroyer or suicide. All these statutes are based upon the idea and theory that the victim of the accused is not cognizant of the purpose or intent of such accused in preparing the means for the destruction of the life of such intended victim or that the poison must be given against the wish of the taker. It is not and has not been a violation of law in Texas for a person to take his or her own life. Whatever may have been the law in England, or whatever the law may be there now with reference to suicide or in any of the States of the federal union, where they have so provided by statute with reference to suicide, the punishment of persons connected with the suicide

by furnishing means or agencies or affording an opportunity to the suicide to take his or her life, has not obtained and does not obtain in Texas. So far as our law is concerned, the suicide is innocent of any criminality. Therefore, the party who furnishes the means to the suicide is also innocent of violating the law. It may be a violation of morals and ethics and reprehensible that a party may furnish another poison or pistols or guns or any other means or agency for the purpose of the suicide to take his own life, yet our law has not seen proper to punish such persons or such acts. A party may furnish another with a pistol, knowing such party intends to take his own life, yet neither would be guilty of violating any statute of Texas. So it may be said of furnishing poison to the suicide. However, a party would not be justified in taking the life of the party who desires to forfeit his life by shooting the would-be destroyer at his request, for in that case it would be the direct act of the accused, and he would be guilty of homicide, although he fired a shot at the request of the would-be suicide. So it would be with reference to poison. If the suicide obtains the poison through the agency of another, that other knowing the purpose of the suicide to take his own life, the party furnishing it would not be guilty, yet if the party furnishing it, knowing the purpose of the suicide, and he himself gives the medicine or poison by placing it in the mouth or other portions of the body, which would lead to the destruction of life, then it would be the act of the party giving, and he would not be permitted to defend against the result of such fact. If appellant furnished Miss Baxter with the carbolic acid at her request, with full knowledge on his part that she intended to take it, and did take it, and destroyed her life, he, having no further agency in it, would not be guilty. But if knowing her purpose of destroying her life, at her request he prepared the medicine and himself placed it in her mouth, and she swallowed it, then it would be an administration of this poison and he would be punished in case of death as a murderer. Tested by these rules, we are of opinion that this count in the indictment is not sufficient.

With reference to the first count, it may be disposed of by stating that there is no evidence in this record to support its allegation. That count is predicated upon a state of facts which charged that the accused took the carbolic acid under the impression that it was a medicine, being ignorant of its deadly character. There is no evidence in this record directly or indirectly, immediately or remotely, intimating such condition of things.

The statement of facts is voluminous, and deals much in far-afield facts, having no connection, or if any, very slight with the case; much of it suspicion and vague conjecture. Without attempting to go into anything like a detailed statement of the evidence, the substance of the facts, bearing on the appeal, may be stated about as follows: Miss Baxter was a girl fully grown, and was known to have associated with the defendant on several occasions, perhaps oftener

than with any other person among her male friends or associates, and on several occasions the opportunity was afforded by which they could have had sexual intercourse, and the result proved that either he or some other one of her male associates had had intercourse with her, for at the time of her death the autopsy discovered that she was seven or eight months advanced in pregnancy. There is some evidence to the effect that she had ample opportunity to have secured this poison either herself, or through others at a drugstore which she frequently visited. The witness Hart testified that on Tuesday before the death of deceased, appellant bought an ounce vial of refined carbolic acid, which he labeled "poison," etc. as they usually do in selling those poisons; and he further testified that appellant bought another ounce of crude carbolic acid on Saturday before the death of the girl. Both bottles were properly labeled and cautioned against poison. Appellant testifying in this connection, stated that on Tuesday he bought a four ounce vial of carbolic acid, which he carried to the ranch, over which he had control, for the purpose of killing screw-worms in animals, and that on Friday, and not Saturday, he bought an ounce of another kind 'of carbolic acid. The four ounce vial of carbolic acid was shown to have been on the premises under appellant's charge at the ranch. The other he testified he placed in his saddle-pockets and in chasing some cattle around the pasture lost it. Hart went to the place where the girl was found dead, and was in company, it seems with the officers, when the two vials were found near the body of deceased, one immediately at the body, and the other a few feet away, and some suggestion perhaps came from him in regard to appellant having previously purchased two bottles of carbolic acid. These bottles, however, found there had no label on them, though both were ounce vials. This witness finally admitted that the girl had frequently gone to his drugstore and engaged in conversation with him. On the night of the homicide the girl slept in one of the rooms of her father's residence, and some time, perhaps after midnight, along about one o'clock, as near as the witnesses could discover, she disappeared from her room in her night apparel. About half after one to two o'clock her absence from the room was discovered, and an immediate search instituted. The father sought around the place to discover some evidence of her retreat; finally he discovered her barefoot tracks leading from the house in the direction of a patch of sorghum cane. Following these tracks to within a few feet of her body he found her upon the ground practically upon her back dead, the evidence showing that she had swallowed or taken carbolic acid. One of the vials was found at her body, and the other a few feet away with the ground saturated under the mouth of the bottle as if the contents had escaped and been absorbed by the earth. There was a commotion raised, parties came in, and the theory was suicide. Bearing upon this, sometime prior to the homicide, the girl had undertaken to take her life by means of strychnine, but being in the little town of Archer, with a doctor near at hand, who being

called in, saved her life. The doctor cautioned her father to watch her; that she might commit suicide at any time.

Four days after the homicide there was an examining trial held, appellant having been arrested in the meantime. The theory, it seems, of the prosecution at that time was that appellant had either furnished deceased the means of taking her life, or that he had obtained the two vials of poison and had had a meeting in accordance with a pre-arranged agreement at the point where the girl was found dead, and with the understanding that they would meet at this point, each to commit suicide, one taking the contents of one bottle and one the other. This was but a theory, superinduced, perhaps, to some extent, by the fact that at a certain distance varying from eighty to two hundred yards a track was found which corresponded somewhat, or, as the witnesses say, "fitted" a shoe that appellant was shown to have owned. Around and about the body itself no evidence of these tracks was found, though there is some testimony showing that a part of a shoe track was seen a short distance away from the dead body. However, some distance away, perhaps from eighty to two hundred yards, a track was discovered that could be identified or measured. While this testimony is anything but convincing, still it is stated as a part of the case. The girl's barefoot track, she weighing about 120 pounds, was easily traced to within a few feet of her dead body, but the track of a heavy man, supposed to be wearing high-heel new shoes, could not be identified anywhere closer than from eighty to two hundred yards, as we gather from the record. Be that as it may, these matters seem to have afforded the basis for the State's conclusion that appellant had met the girl by appointment and had agreed with her to commit suicide. On this trial, appellant's contention to meet this theory was that even under that state of facts, it could be no violation of the law under our statutes and the authority of Grace v. State, 44 Texas Crim. Rep., 193. Another theory relied upon by the State at the final trial was, to wit: that appellant met the girl at the place where she was found dead and by force caused her to take some or all of the poison, and evidence was introduced pro and con with reference to bruises found about her body. A further theory of the State was appellant had been engaged to the girl, and had seduced her or debauched her, and that he had become engaged to another girl and was anxious to get rid of the deceased in order that he might marry the other woman to whom he was in fact engaged. There is no evidence, however, as we recollect the record showing he was engaged to the deceased. We deem it unnecessary to discuss this theory, or any further circumstances connected with it. It seems that on the evening before the homicide Miss Baxter, the deceased, called at the residence of the sister of appellant, which also constituted his home. Appellant was not present at the time, but going away from there to her sister's in the opposite part of town, it seems that she met appellant on the street, and talked with him for a few moments, and they separated. In following the tracks from the dead

body some distance to where the party should have crossed a ravine, some part of which was a little soft from previous rains, they discovered one track said to be distinct. From there to the residence of appellant there was no effort, it seems, to follows the tracks, or if there was, it proved unsuccessful, and as we understand the record there was no attempt made to discover tracks leading from and returning to appellant's residence. It may be perhaps necessary to state that the ground about the place of the supposed homicide or tragedy, and around it for some distance, was cultivated land. In other words, the whole matter occurred inside a field. The little branch spoken of seems to have been in a pasture adjoining the field. Appellant denied his presence at the place where the girl was found dead; denied furnishing her any carbolic acid, and fully explained by his testimony his connection with any carbolic acid, and was to some extent sustained by witnesses, one of whom was owner of the ranch, under whom the appellant was working, in regard to the four-ounce vial of carbolic acid. He was not sustained by any evidence as to the loss of the other carbolic acid. In connection with this, appellant proved an alibi by himself and other witnesses, and there was no attempt, as we understand from the record, to contradict his alibi up to the hour that he was sustained by other witnesses, say until about eleven o'clock at night, or in the neighborhood of that hour. In support of the alibi theory, appellant and his witnesses show that he retired about the hour indicated, and everybody in the house went to sleep. A niece of appellant slept in the adjoining room, a thin partition wall dividing them, and this girl testified that her uncle retired at the time indicated, and did not, so far as she was aware, leave the house during the night as did other inmates of the house. Appellant himself testified that he did not leave the house; that he went to bed and slept preparatory to getting up early the next morning for an intended trip to Wichita Falls. He had been making preparations for two or three days to make such trip to Wichita Falls. This seems to have been known, and the following morning he and a friend went to Wichita Falls, a distance of some twenty-five miles. He denies having gone to the place of the homicide as well as all knowledge of the girl's death until he subsequently heard of it. The age of the tracks was not attempted to be shown, whether they were recently made or had been there for some time.

The court charged the jury, among other things, as follows: "If you find and believe from the evidence herein, beyond a reasonable doubt, that the defendant, A. J. Sanders, in the county of Archer and State of Texas, at any time before the 2nd day of October, 1906, did with malice aforethought intending and contriving to kill Pearl Baxter with poison, administer to or cause to be taken by the said Pearl Baxter into her stomach a quantity of carbolic acid, and if you believe that said carbolic acid in the quantity so administered was a deadly poison and if you believe that the defendant knew the said carbolic acid was a deadly poison, and if you believe the said carbolic acid so administered

by the defendant then and there caused and produced the death of the said Pearl Baxter in the county of Archer and State of Texas, you will find the defendant guilty of murder in the first degree as charged in the second count of the indictment." This is part of subdivision five of the charge. Subdivision seven is as follows: "If you believe that Pearl Baxter voluntarily took carbolic acid for the purpose of causing her death and thereby caused her death, you will find the defendant not guilty, though you should believe that the defendant procured and furnished her, the said Pearl Baxter, with said carbolic acid, and knew at the time that he so furnished the same, that she, the said Pearl Baxter, would use the same to take her life. Or if you have a reasonable doubt as to whether or not she committed suicide by voluntarily taking her own life you will find the defendant not guilty." Exceptions are reserved to the first subdivision of the charge quoted, because it is in contradiction of the latter subdivision quoted, and that they are practically the same, in substance, and virtually authorizes in the first quotation a conviction on a state of facts, which the court, in the latter subdivision, informed the jury would afford no ground for conviction; that the two charges are therefore directly antagonistic to each other. These charges are not clear. That portion of the charge which authorizes a conviction of murder, would justify the jury in acquitting because everything in the charge can be literally true and appellant innocent of murder by poison as is stated in the other charge quoted. He may have intended and contrived to kill Pearl Baxter by giving her poison, or advising her to take it, with full knowledge on his part that carbolic acid was a deadly poison and would result in her death if taken, and it may have produced the desired result, yet if he did not in person cause her to take it, under the facts of this case, by the violence sought to be proved by the facts, he would not be guilty, for otherwise she would have taken it voluntarily, although appellant may have induced her to commit suicide. However, we deem it unnecessary to go further into a discussion of this phase of the case as we have sufficiently discussed it in regard to passing on the motion to quash the second count, and we might say, if it be conceded we are in error in holding the second count insufficient, that the charge would still be insufficient in that it omits the essential elements which it takes to constitute appellant guilty under the law and facts of this case. The court submitted the first count also as a predicate for conviction. As before stated, there is no evidence in the record justifying the jury or the court to arrive at any conclusion that the girl took the poison believing it to be a medicine, for it is evident if she took it voluntarily it was for the purpose of committing suicide, or if appellant forced it down her throat and made her take it, it was then done on his part for the purpose of taking her life, and it was not understood by her to be administered either by herself or by the defendant as a medicine. If taken by herself, it was suicide; if given by appellant by means of force it was murder. The charge, therefore, with reference to giving carbolic acid

as a medicine, we are of opinion, is not justified by any fact in the record. Appellant sought to some extent, at least, to correct the court's charge by asking the following charge, which was refused: "If you believe from the testimony in the case that the deceased, Miss Pearl Baxter, took and swallowed carbolic acid resulting in her death, and that when she swallowed it, she knew that it was carbolic acid, and would result in her death, then she committed suicide, and you will return a verdict of not guilty against the defendant in this case, even though you might believe from the testimony that the defendant was present at the time the deceased swallowed the acid, and urged her to swallow it, and even promised to take carbolic acid himself if she would take it." This charge should have been given under the facts. If the State's theory is a correct one and appellant was there at the time of the death of Miss Baxter, and she took the carbolic acid herself and swallowed it for the purpose of destroying her life, then it was a case of suicide, and no portion of the court's charge called the jury's attention to this particular phase of it, whereas the special charge did.

The father of Miss Baxter was used by the State as a witness, and on his cross-examination appellant asked him if it was not a fact that a month before the death of his daughter, Miss Pearl Baxter, and about the time that Doctor Matthews had treated Miss Pearl for strychnine poisoning, that said Matthews had told him that his daughter Pearl had tried to kill herself, and that she would do it again, and that he had better watch her carefully. The witness would have replied in the affirmative had the court permitted him to answer. The State's objection to the question and answer was that it was immaterial and not binding on the State. The purpose for which this testimony was sought was to throw light upon the acts and conduct of the witness Baxter occurring on the night of the 19th of August, 1906, when his daughter was found dead, and for the further purpose of affecting the credibility of the said witness Baxter, for it is recited in the bill that he had testified on direct examination that his daughter had always been cheerful and happy. As this bill presents the matter, we are of opinion that the witness should have been permitted to answer this question. By the testimony of this witness on direct examination he had stated to the jury, and left the impression upon their minds, if they believed him, that his daughter had always been cheerful and happy. Now, if he had been informed by the physician who attended his daughter at the time she undertook to take her life by the use of strychnine, and the information from the doctor that she had undertaken to commit suicide, and would do it again, and cautioned her father to watch her, it might have an important bearing on the weight of this witness' testimony as tending to discredit him, for he, as it seems, stated at the trial the girl had been contented, which was totally at variance with the fact that she had sought to take her life on a previous occasion which was also known to him. The knowledge of the fact that she had sought to take her life on his part was seriously con-

tradictory of his statement that she had always been cheerful and happy. The jury should have been permitted to weigh this witness' testimony with this fact before them. This witness was further asked on cross-examination if it was not a fact that on the morning following the night his daughter was found dead, and after daylight and the sheriff and physician had been called, if, up to that time, he had not been of the opinion that his daughter, Miss Pearl Baxter, had simply committed suicide, and that he had so expressed himself to a number of persons throughout that day. The witness would have answered, yes, if permitted to do so. The State objected because what his opinion or suspicion was on the day following the death was immaterial. This was offered for the purpose of impeachment and effecting the weight to be given this witness' testimony, for he had testified on direct examination that when he first reached his daughter's body, about two o'clock in the morning, he found the sorghum, weeds and vegetation mashed down for several feet around her body, and that when he examined her body he discovered various spots about her face and body, appellant's contention being that if he had really seen said things, as detailed by him on this trial, he could not have had the suspicion and the opinion that his daughter had simply committed suicide. In the attitude in which this record is presented, we are of opinion this testimony should have gone to the jury. If it was a fact, as testified by Baxter, that there were various spots about her face and body, indicating violence, he would have hardly been truthful in informing the neighbors, the sheriff, and officers and physician, that he believed his daughter had committed suicide; at least, it was a matter of impeachment to show that his testimony on the final trial was at variance with his statements at the time of and just after finding the dead body. We have always understood that statements made outside of court by a witness contradictory of statements made on the trial, in regard to the same matter, form a basis for impeachment, and should go to the jury for the purpose of attacking the credibility and affording a criterion by which the jury could weigh the testimony of such witness.

In this same connection, the witness was further asked on cross-examination, if on the day following the night of his daughter's death, or at any time up to Friday thereafter, the date of the examining trial of the defendant, he had had any suspicion that his daughter prior to her death, had received any external violence of any sort. He would have answered, if permitted to do so, in the negative. The State objected on same ground as before, that the suspicion or opinion of the witness was immaterial. This testimony was offered for the purpose of impeaching this witness and effecting his credibility before the jury inasmuch as he had testified on direct examination to various spots and discolorations on the face and neck of his daughter as discovered by him on the morning of her death, and yet admitted that on Friday after her death, while testifying against defendant on the examining trial, that he had seen upon the body of his daughter no marks whatever of

any external violence inflicted upon her. This testimony should have been admitted for reasons stated above. If on the morning following the death of his daughter, he believed and stated that his daughter committed suicide, and on the examining trial on Friday afterward, he stated he had seen no such marks on the body of his daughter or evidence of external violence, as he testified to on final trial, certainly it would be admissible to impeach him by showing those statements on his part contradictory of his testimony on such final trial that he saw such marks. Some of these statements were made out of court and some made under oath on the examining trial, and they were contradictory of his testimony on final trial.

Miss Loel Baxter was permitted to testify that on Sunday evening, the 18th of August, 1906, late in the evening, her sister, Miss Pearl Baxter, went to the house of John Baggett, where the defendant had his home. Also by Mrs. J. L. Baggett that the deceased, Miss Pearl Baxter, frequently came to her house at times when the defendant was not there and when he had no knowledge of this young lady being there. Appellant objected to the introduction of this evidence because it did not appear that appellant had any knowledge and notice whatever of these visits, and was not, therefore, bound by any of said visits, and ought not to be affected by any inference or presumption that might be drawn by the jury from said visits, and that said testimony, as well as said improper inference or presumption, was perhaps calculated to injure the rights of appellant and prejudice the jury against him. If this evidence was introduced for a sinister purpose, and it may have had that effect, it was not admissible. Appellant was not bound by any visits or social intercourse with Miss Baxter, the deceased, may have seen proper to have or carry on with her friend or friends, even including the sister of appellant. This may have had the effect and doubtless did upon the jury of inducing them to believe that there was some ulterior purpose on the part of Miss Baxter in visiting Mrs. Baggett in connection with appellant, because it was the home of the appellant. There seems to have been no connection whatever between appellant and deceased's visits, and he was, as far as the matter is shown, not aware of the fact that she was there, he himself being absent. We believe this testimony was inadmissible as presented.

In conclusion, we have examined this record with considerable interest. It is a peculiar case in many respects. Upon another trial we would suggest, as we understand the case, the theories pro and con, much of which is pure speculation and theory, that there are and can be but two issues, if the case should develop again as it did upon this trial, calling for a disposition at the hands of the jury. The State must rely upon the fact that appellant was present and forced the girl to take the medicine, and the defendant's theory is that he was not present, that she took it voluntarily and without his having assisted her in any way, or having forced her to do so—and without his knowledge. In other words, his theory is that she voluntarily took it; and,

second, that he was not present and had no connection with it whatever, and third, that he was absolutely innocent of the whole transaction. There are some circumstances in this case that would indicate there might be other parties who are more fully cognizant of the facts in connection with the girl's death than they saw proper to tell or admit. As presented, the other questions are not discussed.

For the errors indicated, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*